**GULF PRODUCTION CO. v. ADAMS et al.**

No. 2662.

Court of Civil Appeals of Texas. El Paso.

April 21, 1932.

Rehearing Denied May 12, 1932.

John E. Green, Jr., of Houston, Paul Moss, of Odessa, and P. O. Settle and R. E. L. Batts, both of Fort Worth, for appellant.

Thomas & McDonald, of Big Spring, Warren B. Phillips, of Longview, and Russell, Hubbard & Kerr, of Pecos, for appellees.

PELPHREY, C. J.

On August 23, 1928, Albert Adams, an employee of B. H. and J. J. Willis, independent contractors, loaded a new motor, weighing about 5,000 pounds, on a wagon which he was driving and hauled it to the State-Lassiter Well No. 4, of the Gulf Production Company.

At the well there was an engine house approximately 16 feet square with a door from 6 to 8 feet wide on the north side. In the engine house was an old motor which was to be replaced by a new motor. Adams dragged the old motor out of the engine house in a northeasterly direction from the engine house door, and there left it. He then backed up his wagon to the engine house door and unloaded the new motor, placing it on the foundation where the old one had been. Adams then drove his wagon to the north end of the old motor for the purpose of loading it thereon. While Adams was still there a gang of men employed by appellant came to the engine house with a truck upon which was loaded a grid or transformer for the purpose of placing it also in the engine house upon a foundation which was located between the motor bed and the door.

Adams began digging a trench at the north end of the old motor, and appellant's crew backed the truck up in front of the engine house door and began unloading the grid or transformer. While the same was being unloaded, it fell off the skids and fell on Adams, injuring him. Adams filed suit against appellant alleging that its employees were negligent in failing to wait their turn and until he had loaded the old motor upon his wagon before they began to unload the transformer; that they were negligent in placing the truck and skids dangerously near his wagon; and that they failed to properly brace the skids.

The Royal Indemnity Company, who carried workmen's compensation insurance for B. H. and J. J. Willis, and who it was agreed had paid Adams $3,000 compensation, intervened and prayed that, upon a recovery by Adams against appellant, the amount it had paid Adams be adjudged to it.

Appellant answered both Adams' petition and Royal Indemnity Company's petition in intervention by general demurrer, special exceptions, general denial, and specially pleaded that Adams, at the time of his injuries, was an employee of B. H. and J. J. Willis, and was at all times under their control and subject to their orders; that its servants and employees exercised no control over his movements and made no attempt to do so; that he was guilty of contributory negligence, in that he would not have been in a position to be struck by the transformer if he had been giving proper attention to his duties; in not moving the old motor sufficiently far away from the engine house to enable him to do his work without being exposed to the dangers incident to the unloading of the transformer; in continuing to work in preparing to load the old motor when he knew or should have known the danger of his position and deliberately exposed himself to the dangers incident to the unloading of the transformer; that when the grid fell he was in a position where his duties did not require him to be; that he did not heed the warning given by appellant's employees; in selecting an unsafe rather than a safe place to work; and in voluntarily coming to and being under the grid when it was being unloaded thereby assuming the risks incident thereto.

Appellant prayed that it be protected from a double recovery by reason of the Royal Indemnity Company's intervention.

In response to special issues the jury found:

(1) That Adams sustained injuries; (2) that appellant's employees failed to wait their turn at the engine house until Adams had loaded the old motor; (3) that such failure was negligence and a proximate cause of Adams' injuries; (4) that appellant's servants placed the truck and skids dangerously near the wagon and old motor; (5) that such placing was negligence and a proximate cause of the injuries; (6) that appellant's servants failed to properly place and brace the skids used in unloading the transformer; (7) that such failure was negligence and a proximate cause; (8) that Adams was attempting to load the old motor at the time the transformer fell; (9) that he was not negligent in attempting to load the old motor at the time. the transformer fell; (10) that Adams did not hear a warning that the transformer was slipping in time to have moved out of its way as it fell; (11) that Adams did not know of the danger of his position incident to unloading the transformer in the manner and at the place it was unloaded; (12) that he was not negligent in remaining where he was while the transformer was being unloaded; and (13) that $14,333 would reasonably compensate Adams for his damages.

Judgment was rendered against appellant for $14,333, $3,000 to Royal Indemnity Company and $11,333 to Adams. This appeal has been prosecuted from such judgment.

## Opinion.

Appellant's contentions are that from Adams' testimony he was in a position where it was physically impossible for the transformer to fall on him; (2) that if he had been attending to his duties at the point where he testifies he was, he would not have been injured; (3) that Adams was negligent in not dragging the old motor far enough away, to enable him to do his work without danger; (4) that Adams, knowing the transformer was to be unloaded, having seen the truck back up to the door, the whole transaction being within his view, and he being experienced in the handling of heavy machinery and knowing the dangers incident to the handling thereof, was negligent in not looking out for his own safety; (5) that he voluntarily placed himself in a position of danger; (6) that appellant's servants did wait their turn at the engine house; (7) that it did not place its truck and skids dangerously near the wagon and old motor; (8) that it properly placed and braced the skids; (9) that the evidence fails to show that any act or combination of acts alleged by appellees was a proximate cause of Adams' injuries; and (10) that the court erred in refusing a peremptory instruction in its favor and in refusing certain of its requested special issues.

Several of the above contentions call into. question the testimony of Adams himself, and we shall quote what we consider the material parts thereof relative to the questions raised:

"Q. What did you first when you got to the place where you were injured? A. Well, I had ——— ordered to wait until they got there. I didn't know what they were going to do.

"Q. Wait until who got there? A. I believe it was the concrete gang.

"Q. Where did you go when you got to this lease? A. I didn't go any place.

"Q. Where did you stop? A. I stopped at Well No. 4.

"Q. What did you do then? A. I waited. there until they came, and then I pulled the old motor out of the engine house.

"Q. How did you pull it out? A. I had to use the team.

"Q. Tell the jury how you did that. A. I just pulled it out of the engine house, and then pulled it out of the way.

"Q. Who told you to do that? A. Mr. Skinner.

"Q. Who is he? A. I believe he is the head electrician.

"Q. For who? A. The Gulf Production Company.

"Q. Alright. Then what happened? A. When we got the old motor out we put the new motor in.

"Q. In where? A. In the place of the old one.

"Q. You mean by the new motor the motor that you were hauling? A. Yes, sir. Then he told me to pick up the old motor and take it back to the McElroy Ware House.

"Q. Who told you that? A. Mr. Skinner.

"Q. Alright. A. And I pulled my wagon over behind the—

"Q. Pulled your wagon over behind the old motor? A. In front of it rather.

"Q. Where were you with reference to the engine house then? A. Well, I was North.

"Q. How far, and how was your wagon headed with reference to the engine house? A. Well, I think it was headed just about North.

"Q. Did you back up to it or drive by the side of it? A. I skidded it over; cut my leaders over and skidded it.

"Q. Who helped you do that? A. No one.

"Q. Did that by yourself? A. Yes, sir.

"Q. Was there any lifting to that? A. No, sir, then I went to digging out from under this old motor so I could set the skids under it.

"Q. So you could set the skids under it for what purpose? A. To load the old motor.

"Q. What are skids? A. About six by eight timbers is what we had, possibly twelve or fourteen feet long.

"Q. You were digging out from under the old motor to put your skids under it so you could get it on to your wagon? A. Yes, sir, I had just dug out from under the motor and pitched my shovel over and turned my face towards this Grid.

"Q. You say facing the Grid. When did the Grid arrive? A. They had backed in there, and set their skids, and were unloading that new motor.

"Q. Who had backed in there? A. The Gulf Production Company.

"Q. What was on the skids? A. It was a transformer, or Grid, it was the first one I ever helped to handle, but it was about twenty six or thirty inches, the narrow way and possibly three feet and maybe four feet the long way.

"Q. About what would it weigh? A. Well, I don't know what it weighed, some of them told me it weighed fifteen hundred pounds.

"Q. You say they backed in there. How did they back in there? What was the Grid on? A. It was on a truck.

"Q. Now with reference to the opening in the Engine Room, where are its openings? A. Well, the big door is on the North end, then there is a small door leads from the south end on out to the derrick floor.

"Q. How wide is this door on the north end approximately? A. I think it is eight feet, maybe wider.

"Q. Now where is this old motor after you put it out with reference to the door? A. When I pulled it out of the house, I pulled it a little more to the east side of the door, and straight out, to get it out of the way.

"Q. How far from the door? A. I don't think over eight or ten feet.

"Q. And was it nearer the center of the door, nearer the center or to the east, or west side of the door? A. Well, it was to the east side of the door.

"Q. At the time you unloaded the motor who helped, or who else was there besides you? A. I think there were three gangs there then.

"Q. How many men were in each gang? A. I don't know that. There were twelve or fourteen men there in all.

"Q. After you dragged this old motor out, you say you were digging a space out from under it? A. Yes, sir.

"Q. Digging a space out so you could put your skids under it? A. Yes, sir.

"Q. When did this truck with the Grid on it come up there? A. They were already there when I unloaded the new motor.

"Q. Had they backed up at that time? A. No, sir.

"Q. When did they back their truck in there? A. When I pulled my wagon over to load this other motor they backed in there.

"Q. Did you see them back the truck in there? A. I suppose so I was working there.

"Q. Do you have any independent recollection now of having seen them back in? A. No, sir, I haven't.

"Q. How far was that truck from you? A. I judge it was about five feet from the wheel base over to the motor, four or five, but I don't think it was over five feet.

"Q. Where were you working with reference to the truck and the motor, between the two, or—A. Yes, sir, I was working—the north end of the motor was just about even with the South end of the truck, and I was digging out there.

"Q. Which direction was that truck headed? A. North.

"Q. Go ahead, you were digging out there, and what? A. I was digging out there so I could get my skids under it.

"Q. When they backed the truck up there, tell this jury what they did with reference to getting ready to unload the Grid. A. I don't know I wasn't paying any attention to them, or what they were doing, because I had my work there, and I was doing it and when I got this motor dug out from under, I pitched my shovel over the motor and turned around facing them and when I turned around that Grid struck me.

"Q. When these skids were placed there at the end of the truck where were you with reference to the end of the truck? A. East.

"Q. How far? A. Possibly six feet.

"Q. And where were you with reference to the end of the truck? A. I was a few feet east, well about south east of the corner of the truck.

"Q. Were you nearer the skids than you were the truck? A. Why, I expect I was nearer the skids than I was the truck, because they had done got the Grid off the truck, and were pulling it down the skids.

"Q. How far down the skids had it gone? A. Not far.

"Q. You were standing about six feet from the truck? A. I wasn't six feet from the skids.

"Q. How far were you from the skids? A. Possibly two or three feet.

"Q. Go ahead, and start back where you were while ago. You said you were digging out from under the motor and now go on from there. A. When I got through digging out from under the motor I pitched my shovel over the motor and just turned around facing the other way, and just had finished digging, and when I did that that struck me right in the breast.

"Q. What struck you? A. The Grid.

"Q. How far were you from the skids at the time it struck you? A. I must have been three feet.

"Q. Did the skids break? A. No, sir.

"Q. Did they slip out? A. One of the skids slipped out.

"Q. Which one? A. The east skid.

"Q. Did that cause the Grid to fall? A. Yes, sir.

"Q. Alright, when the skid slipped out what happened to the Grid? A. It fell on me.

"Q. You say the Grid hit you? A. Yes, sir.

"Q. Then what happened? A. It knocked me backwards.

"Q. It knocked you down? A. Yes, it covered me from just below the knees pretty near up to my chin."

On cross-examination he testified:

"Q. Where was this truck when you unloaded the new motor? A. I don't remember that; of course they stopped back behind my wagon, and I don't know if they moved up or not.

"Q. When you moved your wagon out what did the truck do that had the electric Grid on it? A. They backed in there.

"Q. In your wagon tracks? A. About.

"Q. Did you know that they were going to unload the Grid or had it there for that purpose? A. I knew that they had it there for that purpose.

"Q. You saw them backing in didn't you? A. Yes, sir.

"Q. I asked you while ago if you saw them place the skids? A. I said I didn't, that if I did I didn't know it.

"Q. You were not paying any attention? A. I don't remember.

"Q. What you mean to say is that you were not paying any attention? A. I was busy, I had my own job to do. Yes, sir.

"Q. I believe you stated while ago that you dragged this old motor out ten or twelve feet north of the engine house? A. I think I said eight or ten feet.

"Q. And that the east part of the old motor was five or six feet, something like that east of your east wagon track? A. About five feet I judge east of the track.

"Q. And that you dug two holes, were you digging a hole or a trench? A. I didn't dig two holes; I dug a trench clean across the end of that motor, underneath it.

"Q. Along the north side? Did you dig this trench along the north side? A. North end of the motor.

"Q. You are left handed? A. Yes, sir.

"Q. You began digging over on the west side and finished digging on the northeast corner? A. Yes, sir.

"Q. When you finished doing that you pitched your shovel over? A. Yes, sir.

"Q. Where you got hurt was immediately south of the south end of the truck? A. Yes, sir.

"Q. Between that and the motor? A. Yes, sir.

"Q. When you fell did your head strike the motor? A. No, sir.

"Q. You fell south of the motor? A. I fell angling; I didn't fall straight backwards towards the motor.

"Q. Did you fall south of the old motor? A. I fell in just about a southeasterly course.

"Q. And your head was south of the motor? A. I don't think it was south of it, maybe about the corner of it.

"Q. And you said while ago you were about two or three feet from where the motor slipped and fell? A. Yes, something like that.

"Q. And that was about the south end of the old motor? A. Yes, something like the center of the old motor.

"Q. You say about the center of the old motor? A. Yes, sir.

"Q. What did you dig that trench with? A. A shovel.

"Q. What kind of a shovel? A. Well, a long-handled shovel.

"Q. How long was the handle? A. I never measured it.

"Q. It was not your duty to help unload the Grid or Transformer on the truck? A. No, sir.

"Q. You had nothing to do with it? A. No, sir.

"Q. And nobody asked you to have anything to do with it? A. No, sir.

"Q. You could have pulled that old motor out further if you had wanted to? A. If I had known it would be necessary I could have. I didn't know I was going to have to do that.

"Q. Did you hear Jerry Lewis holler that the skid was slipping? A. No, sir, they were making a racket there. If I had heard him I would not have known what he said, there was a bunch of them there talking.

"Q. You saw the winch on the truck didn't you? A. I had saw it, I don't know that I noticed it then; but I had saw it.

"Q. You knew it was customary to unload a grid with a winch? A. I didn't know, that was the first grid I had ever seen handled.

"Q. Are you sure you never had hold of that grid when it started to fall? A. I am sure I never."

On redirect examination he further testified:

"Q. When they went to unload the grid if they had placed the ends of the skids against

the engine bed state whether or not it could have slipped? A. It couldn't have slipped.

"Q. Counsel asked you if—why you didn't pull the engine out further from the engine house than you did, tell the jury whether or not you knew then that you were going to have to load it? A. I did not.

"Q. Tell the jury whether or not you knew when you were working under this engine that this truck was going to come out and undertake to unload the grid? A. No, sir, I thought the idea was to get me away from there as quick as possible and get me away from there.

"Q. How did you propose to load the motor on your wagon? A. Well, sir, I would put my skids up there, throw the block line from the front end of my wagon and throw the team in front of the wagon.

"Q. Did the defendant's truck wait for you to do that, or did they back up and begin unloading before you finished? A. They didn't wait for me.

"Q. At the time this truck backed into your wagon tracks where were you then? A. I was working with my motor, getting—

"Q. By motor what do you mean? A. The old motor.

"Q. What were you doing? A. I was fixing to dig out under it, or maybe was digging.

"Q. At the time they started unloading the grid what were you doing? A. I must have been digging that trench, because they had not much more than got it off of the end of the truck whenever it fell on me.

"Q. When you were down there working with that engine fixing for your skids were you in plain view? A. Yes, sir.

"Q. Did you know, or were you advised, or warned that they expected to start unloading that grid while you were down there working? A. Never said a word. All they told me was to load that up and get it out of the way.

"Q. Were you advised by anyone that they were in a hurry to start the oil well and were not going to wait for you to get away from there? A. No, sir, I wasn't advised.

"Q. Did anyone tell you that they were in such a hurry that they wouldn't brace the ends of the skids? A. No, sir."

We have quoted Adams' testimony at considerable length, because we feel that it is sufficient answer to several of the propositions advanced by appellant.

■ Appellant argues that Adams' testimony shows that he was at the northeast corner of the old motor when the grid fell, and, therefore, it was physically impossible for him to have been injured while performing his duties around the old motor.

While it is true that Adams, upon being asked if he began digging on the west side of the old motor and finished on the northeast corner, answered in the affirmative; yet the effect of this answer being to place him at the northeast corner of the motor when he finished digging, conflicts with his positive statements that he was between the old motor and the skids at the time he was struck.

Appellant would have us to hold that because of such answer he is precluded from recovering in this case, because he thus places himself in a position where it was physically impossible for the grid to have fallen upon him, under other facts testified to by him. We cannot so hold. The other facts related by him are so positive and direct that, in our opinion, their force should not be destroyed by the answer.

■ By its second and third propositions, appellant asserts that Adams had knowledge of the presence of the truck, knew that the transformer was being unloaded, and with nothing to obstruct his view of the truck and skids, his failure to use his means of knowledge was negligence, and that his failure to drag the old motor sufficiently far away to permit him to do his work in safety was also negligence.

These contentions might be of merit were it not for the fact that Adams' testimony shows that he did not know until he had dragged the old motor out of the engine house that he was supposed to take it away and that he thought the transformer was not to be unloaded until after he had gotten out of the way.

There was nothing which placed him in danger of being injured by the backing in of the truck or the placing of the skids, and the danger only arose when the unloading of the grid began, and, as we construe his testimony, he did not expect that to be attempted until he was out of the way.

Nor do we agree that the evidence conclusively shows that Adams was in a place where he had no business at the time he was injured. The fact that Adams was an experienced oil field worker and that he had engaged for several years in the handling of heavy machinery would not add to the amount of care he was called upon to use, where he did not expect the grid to be unloaded while he was working around the old motor.

■ We think Adams' statement to the effect that he heard no warning and that the men were all talking is sufficient to explain his failure to hear a warning, if in fact one was given.

■ Appellant further contends that it was entitled to a peremptory instruction because there is no evidence sufficient to sustain the jury's findings that it did not wait its turn, placed its truck and skids danger-

ously near the motor, and that it failed to properly place and brace the skids. We shall not here attempt to detail the evidence upon these questions, but, from the above-quoted testimony alone, we think there can be no doubt as to the sufficiency of the evidence to show that the truck and skids were in such position relative to the old motor that the unloading of the grid therefrom carried with it danger to a person working on the west side of the motor. If Adams' testimony is to be believed, and the jury evidently did so, then the skids were in such close proximity to the motor that a man working on the west side thereof was in danger of being struck by the grid falling from them.

There being nothing in the record to show that the skid was caused to slip by reason of anything other than the sliding of the grid upon it, the jury would certainly be justified in concluding that they were not braced as they should have been.

Appellees have objected to our consideration of the propositions advanced by appellant because of nonconformity with the rules of briefing. We have thought it better to decide the questions on the merits.

■ The following issues were requested by appellant and refused by the court:

"Special Issue No. 1: Do you find from a preponderance of the evidence that the means of knowledge, on the part of Albert Adams, incident to unloading and installing the grid or transformer, was open and palpable?"

"Issue No. 5: Do you find from a preponderance of the evidence that Albert Adams knew or should have known the danger of his position incident to unloading a grid or transformer, in the manner and at the place the said transformer was unloaded?"

"Issue No. 7: Do you find from a preponderance of the evidence that Albert Adams heard, or should have heard, the warning to the effect that the grid or transformer was slipping, in time to have moved out of the way of the grid or transformer as it fell?"

"Issue No. 8: Do you find from a preponderance of the evidence that the duties of Albert Adams, required him to be at the point or place where the grid or transformer fell?"

The court's refusal to submit these issues is made the basis of its propositions 12, 13, 14, and 15.

Without here discussing these questions in detail, we have concluded that they present no reversible error.

The controlling issues made by the pleadings and the evidence appear to have been properly submitted, and passed upon by the jury.

■ Appellant further complains of the following portion of the court's charge: "You are instructed that the burden of proof is upon the plaintiff to establish by a preponder-

ance of the evidence, that is, the greater weight of credible testimony, the affirmative of Special Issues Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10, and the negative of Special Issue No. 21, and the amount in answer to Special Issue No. 20, and the burden is upon the defendant to establish by a preponderance of the evidence the affirmative of Special Issues Nos. 11, 12, 13, 14, 15, 16, 17, 18 and 19." Appellant's objection is that the above charge is in effect a general charge, instructs the jury how to answer the issues in order to return a verdict for the plaintiff, and was an undue comment on the weight of the evidence.

While there is some conflict among our courts upon the correctness of the giving of such a charge, yet under the facts here we are of the opinion that it was not error.

As said by the Commission of Appeals in Houston & T. C. Railway v. Stevenson, 29 S.W.(2d) 995, 999: "When plaintiff pleads and relies for recovery upon specific acts of negligence on the part of the defendant, and the case is submitted to the jury upon special issues, it is proper to instruct the jury as to those acts of negligence so charged and relied upon that the burden is upon the plaintiff to establish them by a preponderance of the evidence. When the defendant challenges the right of plaintiff to recover by reason of certain exceptions, and that by virtue of certain exceptions there is no liability on the part of the defendant, and special issues based upon such exceptions are submitted to the jury upon such special issues, it is proper to instruct the jury that the burden is upon the defendant to establish them by a preponderance of the evidence." See, also, Reed v. Bates (Tex. Civ. App.) 32 S.W.(2d) 216; Duron v. Beaumont Iron Works (Tex. Com. App.) 9 S.W.(2d) 1104; Maryland Casualty Company v. Boverie (Tex. Civ. App.) 37 S.W. (2d) 310. It will be noted that the issues as submitted by the court did not require a finding on the preponderance of the evidence; therefore, we think, the instruction was proper.

We cannot agree with appellant's contention that special issue No. 2, as submitted by the court, assumed that there was a duty upon appellant to wait until Adams had finished loading the old motor before it began unloading the grid.

Adams' testimony is to the effect that he was ordered by Skinner to load the old motor on his wagon and expected the unloading of the grid to be postponed until he was out of the way.

■ It is a fundamental rule of law that every person must so conduct himself as not to injure another, and especially would that be true where the other was in a place of danger by his order. The question alleged by Adams and supported by evidence was wheth-

er appellant's servants were negligent in not, with Adams working there on the old motor, waiting until he had finished before backing its truck in beside where he was working and beginning to unload the grid. This we think was the issue as submitted.

We find no error in the court's refusal to submit appellant's requested issue No. 13.

 The objection urged to the court's charge on proximate cause is also untenable. West Texas Coaches, Inc., v. Madi (Tex. Civ. App.) 15 S.W.(2d) 170, affirmed by the Section A of the Commission of Appeals, 26 S.W. (2d) 199. There was evidence from which the jury were justified in concluding that Adams was permanently disabled and their finding of $14,333 damages was warranted.

Finding no reversible error in the record, the judgment of the trial court is affirmed.